# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

RUBEN P. GARCIA,

      Plaintiff,

v.                                                                          No. CIV 01-488 LH/LFG

LARRY G. MASSANARI, ACTING
COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION[1]

      Plaintiff Ruben Garcia ("Garcia") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Garcia was not eligible for disability insurance benefits ("DIB") or supplemental security income ("SSI"). Garcia moves this Court for an order reversing the Commissioner's final decision and remanding for a rehearing. [Doc. 7.]

      Garcia was born on September 14, 1952 and was 48 years old when the administrative hearing was held. He has eleven years of education but did not attain a G.E.D. He previously was employed as a laborer, plumber's helper, and janitor. On October 5, 1999, Garcia filed an application for SSI and DIB, alleging an onset date of December 1, 1998, when he was laid off from his job as plumber's

---

[1] Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations. If no objections are filed, no appellate review will be allowed.

1

helper. Garcia contends that he was laid off because he had missed too much work due to chronic neck pain and/or degenerative changes of the spine. [Doc. 7 at 1; Tr. at 42.] He apparently has worked as a painter, on occasion, since December 1, 1998. [Tr. at 95, 98.]

Garcia's application for benefits was denied at the initial and reconsideration stages, and he sought timely review from an Administrative Law Judge ("ALJ"). An administrative hearing was held on October 26, 2000. In a decision, dated December 28, 2000, the ALJ found that Garcia was not eligible for benefits because he retained the residual functional capacity ("RFC") to do light work and to return to his past work as a plumber's helper. (Tr. at 16.) Garcia challenged this determination to the Appeals Council which denied his request for review on April 5, 2001. This appeal followed.

It should be noted that on April 24, 2001, Garcia's attorney allegedly submitted a recent neurosurgical report from Dr. Paul Shields, dated March 20, 2001, to the Appeals Council. [Doc. 7 at 3, 6.] This March 20, 2001 report is not part of the record but was attached as an exhibit to Garcia's opening Motion to reverse. The Appeals Council apparently did not consider the report, and it is not clear from the decision whether the Council ever received the report. The Appeals Council's decision does not mention the report although it does refer to a January 2001 letter from Garcia's counsel. (Tr. at 5, 162.) Dr. Shields' report states, in part, that he examined Garcia on March 20, 2001, Garcia had "marked degenerated disc at C4-5 with a bulging disc and osteophytic disease which is causing significant spinal stenosis" and "significant degenerative disc disease of the cervical spine." Dr. Shields' report also states that "[t]his has been going on for a year and a half" but he does not expressly conclude that Garcia is restricted in his ability to work either then or previously. Instead, Dr. Shield comments that Garcia has had pain for awhile and is house bound by it. Dr. Shield's examination of Garcia was conducted after the ALJ's decision. It is not clear whether

2

the report is material to the issue of whether Garcia was disabled from the date he applied for benefits to the date of the ALJ's decision.[2] Moreover, there is no confirmation that it was part of the record before the Appeals Council. Therefore, it will not be considered as part of this appeal. *See* Corber v. Massanari, 2001 WL 1203004 at *1, No. 00-3390 (10th Cir. Oct. 11, 2001) (the record to be considered on review includes all of the evidence that was before the Appeals Council, even if it was not before the ALJ); Vasquez v. Apfel, 1998 WL 966087 at *4 (E.D. Pa. Sept. 30 1998) (district court cannot consider new evidence when claimant failed to submit it to the Appeals Council prior to its decision) (*discussing* Jones v. Sullivan, 954 F.2d 125, 128 (3d Cir. 1991)). Garcia, however, (should he satisfy the pertinent deadlines) is not precluded from re-applying for benefits and supplying new evidence he may have regarding his condition.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[3] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining his burden at each step, the burden then shifts to the Commissioner at step five. If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[4]

---

[2] The Appeals Council will consider "new evidence," if it is material (reasonable possibility that it would have changed the outcome) and if it relates to the time period for which the benefits were denied. 20 C.F.R. § 404.970(b); Boone v. Apfel, 1999 WL 668253 at *2 (10th Cir. Aug. 26, 1999).

[3] 20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[4] 20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

Briefly, the steps are: at step one, claimant must prove he is not currently engaged in substantial gainful activity;[5] at step two, the claimant must prove his impairment is "severe" in that it "significantly limits his physical or mental ability to do basic work activities . . . .,"[6] at step three, the Commissioner must conclude the claimant is disabled if he proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[7] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[8] If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[9] age, education and past work experience, he is capable of performing other work.[10] If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[11]

## Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Glenn v.

---

[5] 20 C.F.R. § 404.1520(b) (1999).

[6] 20 C.F.R. § 404.1520(c) (1999).

[7] 20 C.F.R. § 404.1520(d) (1999). If a claimant's impairment meets certain criteria, that means his impairment is "severe enough to prevent him from doing any gainful activity." 20 C.F.R. § 416.925 (1999).

[8] 20 C.F.R. § 404.1520(e) (1999).

[9] One's RFC is "what you can still do despite your limitations." 20 C.F.R. § 404.1545(a). The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy. Those categories are: sedentary, light, medium, heavy and very heavy. 20 C.F.R. § 405.1567 (1999).

[10] 20 C.F.R. § 404.1520(f) (1999).

[11] Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

Shalala, 21 F.3d 983, 984 (10th Cir. 1994). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The Court's review of the Commissioner's determination is limited. Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992). The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Id. at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner. Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

After carefully evaluating Garcia's medical records and his testimony (Tr. at 14-15), the ALJ rejected Garcia's claim for benefits at step four, concluding that he retained the RFC to return to light work as a plumber's helper, a job he had previously performed. (Tr. at 16.) In reaching this decision, Judge Gary L. Vanderhoof made the following findings: (1) Garcia had not engaged in substantial gainful activity since the onset of his disability; (2) he has a severe impairment but not one that meets or equals one of the listed impairments; (3) Garcia's allegations regarding his limitations were not

5

totally credible for the reasons explained in the decision; (4) he has the RFC to perform "light work"; (5) his past relevant work as plumber's helper did not require the performance of work-related activities precluded by his RFC; and (6) Garcia was not under a disability, as defined by the Social Security Act, at any time through the date of the ALJ's decision. (Tr. at 16-17.)

In this appeal, Garcia asserts that the case must be reversed and remanded on the following grounds: (1) Dr. Walsky's medical report supports his allegations of disability and/or the ALJ misinterpreted or could not read portions of Dr. Walsky's report; (2) there is not substantial evidence to support a finding that Garcia could perform his prior position as plumber's helper; and (3) Dr. Shield's medical report should have been considered by the Appeals Council and supports remand. [Doc. 7.] The Commissioner argues that the ALJ's decision was supported by substantial evidence, that Dr. Shields' report is not considered substantial evidence since it is the opinion of a one-time consultative examiner, and that the ALJ's determination of nondisability was consistent with regulatory criteria and relevant case law. [Doc. 8.]

After a review of the entire record, this Court agrees that there was substantial evidence to support the ALJ's findings that Garcia retained the RFC to perform "light work" as a plumber's helper, in accordance with Garcia's description of the demands of that job. Therefore, the Court recommends that Garcia's motion to reverse be denied.

### **Summary of Garcia's Work History and Medical Care/Conditions**

In early June 1992, Garcia apparently fell from a ladder while working and injured his neck. (Tr. at 145, 150.) An MRI was conducted which showed "no disc herniation or central canal stenosis" at the C3-4, C5-6 or C6-7 levels, but that there was posterior, central and left paracentral herniation of the C4-5 disc and "mild disc bulging at C6-7. (Tr. at 145.) Garcia was in physical

therapy for six months and then "sent back to work about a year later, still in pain." (Tr. at 150.)[12] "His neck would get stiff on occasion." (Tr. at 150).

In 1995 and 1998, Garcia made several visits to the Emergency Room ("ER") at St. Vincent's in Santa Fe complaining of an earache. (Tr. at 127-131.) The June 30, 1998 medical record specifically documents that Garcia "has no neck pain." (Tr. at 127.) On September 25, 1998, Garcia again visited the ER, this time complaining of abdominal pain and discomfort. (Tr. at 120). His diagnosis at that time was alcohol induced "acute hepatitis." He was advised to stop drinking. Again, the medical record notably documents, upon physical examination of Garcia, that "[t]here is no neck stiffness." (Tr. at 120.) Garcia was given Demerol for his pain during this visit. (Tr. at 121.) On December 21, 1998, Garcia visited the ER, complaining of chest pain after he pulled a pipe at work. (Tr. at 110.) There is no discussion in the record regarding complaints of neck pain.

Garcia states in the Disability Report that he was laid off his job on December 1, 1998, due to missing work because of neck pain. (Tr. at 42.) Garcia also asserts that December 1, 1998 is the onset date of his disability. The January 15, 1999 ER record is the first documentation in the administrative record since 1992 of Garcia's complaints about neck pain.[13] (Tr. at 108.) The record showed that Garcia had been having neck pain for three days that started after he had been painting all day. The record also documents that he has "good range of motion of his neck" and a "normal

---

[12]Note that this record (Tr. 150) is a neurological evaluation, dated December 20, 1999. The record contains no medical reports between 1992 and early 1999, documenting any complaints by Garcia about his neck.

[13]Garcia apparently told the physician that he had had an MRI done on his neck within the past few years but the doctor noted that it must not have been done at St. Vincent's since he could not find any record of an MRI. Based on subsequent records, it appears that the only previous MRI was done in 1992.

7

neurologic exam." The physician concluded that he might have some cervical radiculopathy[14] but that it was minimal. He was prescribed Percocet (narcotic analgesic) for pain. (Tr. at 109.)

Two weeks later, Garcia re-visited the ER, again complaining of neck pain. The physician noted that he had "good strength and range of motion of both upper extremities. . . ." (Tr. at 104.) Garcia produced an MRI that showed a "slightly bulging disc at C3-C4." He apparently was there to request more pain medication. The doctor noted that he would "give him a small prescription." (Tr. at 104.) Garcia was advised to see a Family Practice physician but he stated he had no money to pay for an office visit.

In April 1999, Garcia returned to the ER complaining of neck pain, after a fall from a ladder. The medical record states he does not drink. Again, "there is good strength and range of motion in all extremities without any weakness." (Tr. at 98.) X-rays were taken but they did not show any further changes from those described in the 1992 MRI. (Tr. at 98.) The physician prescribed muscle relaxants and anti-inflammatories, although no Percocet was prescribed.

Garcia was back in mid-May and the ER physician recommended that he see a neurosurgeon for possible surgery on his neck. (Tr. at 95.) His neurological exam in May was normal. (Tr. at 98.) Garcia was given Lorcet (narcotic analgesic) and Valium. (Tr. at 96.) In June 1999, an ER physician noted some tenderness and spasms in the neck area and prescribed Percocet. In August 1999, Garcia visited the ER for neck pain. He had evidence of muscle spasm on exam but his neurologic exam was normal. He was prescribed Percocet. In September 1999, he returned to the ER for neck pain. His neurologic test showed no atrophy or demonstrable weakness. He was prescribed Toradol (non-narcotic analgesic, but sometimes prescribed together with a narcotic analgesic) and Lortab (narcotic

---

[14]Disease of nerve roots. Dorland's Medical Dictionary.

analgesic) but the physician noted "no refill" and that Garcia was told he needs to see his own doctor to prescribe medications for chronic pain. (Tr. at 80-81.)

In October 1999, Garcia applied for disability benefits. The interviewer's notes regarding the face to face meeting with Garcia indicated that his nose had been broken but that "no difficulties were noted as far as his neck." (Tr. at 57.) On October 28, 1999, Garcia was given a RFC Assessment. The physician stated that Garcia had "DJD[15] of the cervical spine," but that there was "no weakness, paresthesias or atrophy." (Tr. at 133.) His exertional limitations were occasion lifting of 20 pounds, frequent lifting of 10 pounds, standing or walking for about 6 hours of an 8 hour day, sitting for about 6 hours, and unlimited ability to push and pull. No other limitations were found.

Around Thanksgiving in 1999, Garcia came into the ER intoxicated after claiming to have been assaulted. He had a facial fracture and rib injuries. (Tr. at 77-78.) Garcia was given some Demerol and reported to "feel quite a bit better." (Tr. at 78.) On December 7, 1999, Garcia re-visited the ER complaining of chronic neck pain. The doctor noted that Garcia was "moving easily" and that he "often gets narcotics, although he has been given referrals." (Tr. at 74.) Garcia informed the doctor that he had run out of pain medication. He was given Toradol after his old charts were reviewed but the medical record reflects that "we have repeatedly told him that he would not get any narcotics here in the ER without seeing his primary care physician." (Tr. at 74.)

On December 20, 1999, Garcia went to Dr. Walsky for a neurological examination. Dr. Walsky noted that Garcia had been living off of Lortab which he gets from the ER. "When he runs out of medication, he goes back to the ER." This record, in contrast to others, states he drinks a few beers on the weekends. (Tr. at 150.) Dr. Walsky wrote that the most significant finding on exam was

---

[15]"DJD" is not further defined in the RFC Assessment but may refer to Degenerative Disease.

9

a severely limited range of motion of the neck. There was no identifiable spinal cord, nerve root or peripheral nerve abnormality. Dr. Walsky then concluded that Garcia "should benefit from intensive physical therapy, possibly to the point where he can very reasonably consider going back to work. I would certainly not consider him permanently disabled at this point, but physical therapy intervention is indeed essential." (Tr. at 151-52.)

On March 15, 2000, Garcia filled out the Daily Activities Questionnaire with respect to his request for disability benefits. (Tr. at 65.) It contains some inconsistencies; for example, Garcia states that he walks on a regular basis "sometimes," but that he cannot walk one or two blocks on ground level because he "he cannot cope with people." Garcia states that he cannot work or do other projects because he is "too nervous with everything." He also asserts that he cannot comb his hair and that the comb falls because he gets "all nervous." He is able, however to sometimes do household chores and go to appointments. He cannot get along with family and friends but tries to be nice to people in authority.

In 2000, Garcia visited La Familia Clinic a number of times for pain medications related to his neck. (Tr. at 146-48.) The records indicate that he wanted refills on Darvocet (narcotic analgesic) and Lorcet. He complained that non-narcotic medications like Vioxx were of no help. On one occasion, the Nurse Practitioner documented that she would only refill the Lorcet and gave no additional refills. (Tr. at 146.)

On June 7, 2000, the medical records show that he had fatigue secondary to insomnia and questionable depression. When he applied for benefits, he stated that he had never been seen by anyone for emotional or mental problems that limited his ability to work. (Tr. at 44.)

At the administrative hearing on October 26, 2000, Garcia admitted that he had filled out some of the disability paperwork although he had help from his sister in spelling and reading. He also explained that he was being treated for hepatitis. (Tr. at 175.) Finally, he agreed that the medications he was receiving for pain "take his pain away," but when asked by his attorney if the medications took the pain away enough so that he could work, he answered: "No, sir.". (Tr. at 179.)

Garcia's past relevant employment includes working as a plumber's helper from about 1988 through December 1, 1998. He was a landscaper in 1988 and a janitor in 1987. (Tr. at 43.) With respect to his plumber's helper position, he stated that he handed tools to the plumber, did soldering, dug trenches and laid pipe. He lifted and carried copper tubing, plastic pipe and tools but no more than 20 pounds. (Tr. at 43.)

## Discussion

Because the ALJ's made his decision of non-disability at step four, this discussion will focus on the requirements of that part of the sequential analysis. The Tenth Circuit has explained that step four is comprised of three phases: (1) evaluation of a claimant's physical and mental RFC; (2) determination of the physical and mental demands of the claimant's past relevant work; (3) analysis as to whether the claimant has the ability to meet the job demands found on phase two despite any limitations found in phase one. Flores v. Apfel, 242 F.3d 388 (Table, Text in Westlaw), 2000 WL 1694301 at *1 (10th Cir. Nov. 13, 2000) (relying in part on Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir. 1996) and Social Security Rulings ("S.S.R.") 86-8 and 82-62)).

While the claimant has the burden of proving a disability at step four, the ALJ has "a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised. The duty is one of inquiry, ensuring that the ALJ

11

is informed about 'facts relevant to his decision and [learns] the claimant's own version of those facts.'" Henrie v. United States Department of Health & Human Services, 13 F.3d 359, 360-61 (10th Cir. 1993) (internal citations omitted). The ALJ must "fully investigate physical and mental demands of past work and compare them to claimant's capabilities." Henrie, 13 F.3d at 361 (*relying on* Nimick v. Sec'y of Health & Human Services, 887 F.2d 864, 866 (8th Cir. 1989)). The ALJ must make these findings himself on the record. Winfrey, 92 F.3d at 1025. Here, a careful examination of the record shows that Judge Vanderhoof's analysis was thoughtful, thorough, and in accord with his obligations under federal law.

### A.    *Phase One:*

During the phase one analysis, Judge Vanderhoof noted first that he had considered Garcia's attorney's request for a psychological evaluation but found no grounds to support the need for that examination. Garcia had no history of mental health problems and none of the objective medical evidence shows otherwise. Therefore, there was substantial evidence to support the ALJ's conclusion that Garcia did not suffer any limitations due to mental status. (Tr. at 14.)

Judge Vanderhoof proceeded to examine Garcia's physical RFC. The ALJ considered all the medical records and all of Garcia's symptoms, including pain. Garcia's 1992 MRI was discussed by the ALJ, although the judge noted that Garcia was able to work for extended time periods as a plumber's helper, subsequent to 1992. Indeed, the objective medical evidence shows no complaints by Garcia about his neck until January 1999. A few 1998 medical records actually document that Garcia had *no* neck pain or stiffness.

Garcia's medical records did show that he suffered a cervical and thoracic back strain in April 1999 while painting a house. Notwithstanding this new injury, the x-rays taken in April 1999 did not

reveal any further changes from those described in the 1992 MRI. The ALJ found that a number of the tests and examinations performed on Garcia in 1999 were generally normal. While some of the examining physicians commented that Garcia had pain or spasms, virtually every one of the physicians in 1999 noted a full range of motion of Garcia's upper extremities, that he moved easily, had good strength and/or no weakness, that there was no atrophy, and that his neurologic exams were normal.

The ALJ properly discounted Garcia's own testimony about the extent of his limitations and his symptoms of pain. (Tr. at 15.) Garcia's testimony that he was unable to do anything because of pain, was nervous, could not comb his hair sometimes, and could not use his hand for writing either was inconsistent or not supported by the objective medical evidence. In fact, none of the examining physicians or medical records supported these assertions by Garcia. In addition, the exams and tests performed on Garcia showed that he had a full range of movement in his upper extremities and that there was no weakness or atrophy. Moreover, Garcia testified clearly at the administrative hearing that the medications he was taking "took away his pain."[16]

### B.    *Phase Two and Phase Three:*

The ALJ also made the second required findings regarding the demands of Garcia's prior work. The ALJ noted that to be relevant the past employment must have been performed within the last 15 years or 15 years prior to the date that a disability is established and that employment must have lasted long enough for Garcia to have learned the job. (Tr. at 16.) Judge Vanderhoof explained that the evidence (provided by Garcia) established that he has past relevant work as a plumber's help and that by Garcia's own description of the demands of that work, it would be considered "light"

---

[16]Although not discussed by the ALJ, Garcia's persistent visits to the ER for narcotic pain killers and the medical providers' notations reflecting their concerns about prescribing him narcotics also raise suspicions about his credibility.

13

level work. Garcia's counsel admits that the ALJ may use the claimant's own description of the demands of prior relevant work in assessing the exertional demands of that position and yet asserts that the ALJ did not fully develop the record. The Court disagrees. Garcia's description of his prior relevant work was adequate for the ALJ to determine Garcia's limitations would not preclude him from performing that job. Moreover, contrary to Garcia's argument, the RFC Assessment revealed no limitations as to stooping, kneeling, crouching, crawling even if Garcia did describe his job as requiring those types of activities. [Tr. at 134.]

The ALJ proceeded to analyze whether Garcia's limitations precluded him from returning the plumber's assistant job. Based on the RFC, the objective record evidence, and Garcia's own description of his prior job demands, the ALJ correctly concluded that Garcia could return to the job of plumber's helper.

### C. The Record was Complete and Provides Substantial Support for the ALJ's Decision:

Garcia's argument that the ALJ misinterpreted Dr. Walsky's report or could not read certain "illegible" portions[17] of the report are unavailing and unconvincing. First, Garcia essentially is asking this Court to re-weigh the evidence or substitute the Court's interpretation of the medical record for that of the ALJ. The Court cannot do this. Hargis, 945 F.2d at 1486.

Second, Garcia's assertion that Judge Vanderhoof concluded Dr. Walsky found "Plaintiff to be 'essentially normal'" is not quite accurate. The ALJ stated that Garcia's "late 1999 neurological examination [by Dr. Walsky] was essentially normal . . . ." (Tr. at 15.) Dr. Walsky's medical report supports this reading. Dr. Walsky documents that Garcia has no complaints concerning his limbs, no

---

[17]Neither the ALJ nor the Appeals Council state that they could not read Walsky's report in its entirety. In fact, to the contrary, the ALJ seems to cite the key portions of the report.

weakness in the four limbs, and no atrophy. Dr. Walsky also states that on neurological examination, "[t]here is no identifiable spinal cord, nerve root or peripheral nerve abnormality" which directly supports the ALJ's interpretation that the 1999 neurological examination was "essentially normal." Again, Garcia's assertions that he cannot comb his hair or hold a comb in his hand seem somewhat doubtful in light of this record, as well as others.

Third, while it is true that the ALJ concluded Walsky's report indicated Garcia was not disabled, this Court cannot interpret Dr. Walsky's statement that he "would certainly not consider him permanently disabled at this point" to mean that Garcia was presently or temporarily without physical therapy as Garcia apparently argues. Again, the Court cannot substitute its judgment for that of the ALJ. Moreover, substantial objective medical evidence supports a finding that Garcia was not disabled and/or that he could return to his previous job as a plumber's helper.

Finally, the Court will not consider Dr. Shield's medical report that documents an exam of Garcia on March 20, 2001, because it is not part of the record before the ALJ or the Appeals Council. Although Garcia's attorney asserts that he mailed the report to the Appeals Council on April 24, 2001, no record evidence has been provided to show that the Appeals Council actually received the report. Even if the Court were to consider the Shields' report, this report is not determinative of a disability nor does it provide overwhelming evidence in the face of other objective medical evidence that Garcia was disabled during the pertinent time frame.

## **Recommended Disposition**

That Garcia's Motion to Reverse and Remand [Doc. 7] be denied for the reasons stated herein and that this matter be dismissed with prejudice.

*(signature)*
Lorenzo F. Garcia
United States Magistrate Judge